UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DOIAKAH GRAY, | ) | |
| | ) | |
| Plaintiff, | ) | 12 C 244 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| IMHOTEP CARTER, WEXFORD HEALTH SOURCES, | ) | |
| INC., MARCUS HARDY, JOE SHEEHY, STEVEN | ) | |
| FISCHMAN, JACQUELINE MITCHELL-LAWSHEA, | ) | |
| and DARRYL EDWARDS, | ) | |
| | ) | |
| Defendants. | ) | |

### Memorandum Opinion and Order

In this *pro se* suit under 42 U.S.C. § 1983, Doiakah Gray, an inmate at the Illinois

Department of Corrections, claims that Defendants violated the Eighth Amendment by being

deliberately indifferent to his alleged temporomandibular joint disorder ("TMJD"), a condition

that causes pain in the jaw joint. Doc. 1. The two sets of defendants—State Defendants

(Jacqueline Mitchell-Lawshea, a dentist; Steven Fischman, also a dentist; Joe Sheehy, a medical

technician; Marcus Hardy, the prison's warden; and Darryl Edwards, the assistant warden), and

Wexford Defendants (Imhotep Carter, a physician; and Wexford Health Sources, Inc., his

employer)—have moved for summary judgment. Docs. 93, 98. State Defendants' motion is

granted, and Wexford Defendants' motion is denied.

### Background

The facts are set forth as favorably to Gray, the non-movant, as the record and Local Rule

56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment,

the court must assume the truth of these facts, but does not vouch for them. *See Smith v. Bray*,

681 F.3d 888, 892 (7th Cir. 2012).

Gray is an inmate housed at Stateville Correctional Center. Doc. 127 at p. 1, ¶ 1. Mitchell and Fischman were Stateville dentists at all relevant times, *id*. at p. 2, ¶¶ 2-3, and Sheehy was a medical technician there, *id*. at p. 2, ¶ 4. Hardy and Edwards were the prison's warden and assistant warden, respectively. *Id*. at p. 2, ¶¶ 5-6. Gray first began experiencing jaw pain in 1999; a doctor prescribed him pain medication, which was effective so long as he took it. *Id*. at pp. 3-4, ¶ 9. In 2001, a dentist diagnosed Gray with bruxism (grinding of the teeth) and malocclusion (a misaligned bite), and prescribed a fitted bite guard. *Id*. at p. 4, ¶ 10. Gray also underwent equilibration, which means his teeth were filed down to help align his bite. *Id*. at p. 4, ¶ 11. Over the next ten years or so, Gray saw numerous doctors, dentists, and oral surgeons, to whom he complained about jaw pain, headaches, head spasms, and migraines, and who in aggregate ordered three more fitted bite guards; prescribed Tylenol, other pain relievers, and muscle relaxants; and removed four teeth. *Id*. at pp. 5-8, ¶¶ 13-22.

One of those dentists was Mitchell, who first saw Gray in 2008. *Id*. at p. 7, ¶ 20. On April 11 of that year, Gray complained to Mitchell of jaw pain; Mitchell thought it was caused by a particular molar, and so referred Gray to an oral surgeon, who removed the offending tooth. *Ibid*. On May 30, 2008, Mitchell saw Gray again, and she prescribed a new bite guard. *Id*. at pp. 7-8, ¶ 21. Gray alleges that he told Mitchell in June and August that he continued to experience headaches and jaw pain and that the night guards were not helping, Doc. 137 at ¶¶ 20-21, although these complaints are not reflected in any medical or dental records. On September 30, 2008, Gray saw Mitchell about his TMJ pain and he requested orthodontics, which she (correctly) said was unavailable to Illinois inmates. *Id*. at ¶ 22. Gray claims that Mitchell told him he would not receive any treatment beyond a night guard because TMJ is a non-treatable condition. *Ibid*.

On February 14, 2011, Gray requested an appointment to see Mitchell about his deteriorating TMJ condition, but she refused to see him. Doc. 127 at p. 22, ¶ 23. The dental records attached to Gray's Local Rule 56.1(b)(3)(C) statement of additional facts, however, show that an appointment was scheduled for March 7, 2011, and later rescheduled for April 6, when defendant Steven Fischman, also a dentist, treated him. Doc. 127 at 39. Fischman treated Gray on at least three occasions in 2010 and 2011, but told Gray in response to his requests for TMJD treatment that he (Fischman) did not treat TMJD. Doc. 137 at ¶¶ 44-45. Gray asserts that Fischman "refused to provide" pain medication to help with his pain, headaches, migraines, and head spasms; yet Gray admitted in his deposition that he did not recall even asking Fischman for pain medication. *Id.* at ¶ 46; Doc. 95-5 at 30.

Gray saw Mitchell for a bi-annual exam on December 2, 2011, when he complained about his deteriorating TMJD; Mitchell prescribed a new night guard and pain medication. Doc. 127 at p. 22, ¶ 25; *id.* at p. 9, ¶ 26. On December 14, Mitchell fitted Gray for a new night guard, which he received (along with more pain medication) on January 20, 2012. *Id.* at p. 9, ¶¶ 26-27. Gray told Mitchell that he wanted to see a TMJD specialist, but Mitchell told him that only Carter, the prison's medical director (and Wexford employee), could refer him to an outside specialist. *Ibid.*; *id.* at pp. 23-24, ¶¶ 27-28.

Gray had previously written a letter to Carter dated September 19, 2011, in which he requested TMJD treatment; Carter, however, does not recall having received it. Doc. 130 at pp. 19-20, ¶ 59. Gray saw Carter only once, on March 9, 2012, two months after he filed this lawsuit. *Id.* at pp. 18-19, ¶ 58. Gray says that he complained about his chronic TMJ pain and asked Carter for a referral to an outside TMJD specialist. *Ibid.* Carter avers that he understood Gray to have "received and [been] continu[ing] to receive treatment related to his complaints of

pain in the area of his TMJ" at Stateville, and that "if in my opinion as Stateville's medical director" he believed that an inmate "cannot be properly treated … at Stateville," he would refer the inmate to an outside facility for treatment. *Id*. at pp. 20-21, ¶ 61; Doc. 100-1 at p. 2, ¶ 8. Carter further avers that when he saw Gray, he "did not find any condition related to [Gray's] TMJ that necessitated a referral to a community medical facility." *Ibid*. In fact, Carter denies that Gray even mentioned TMJD at the March 9 visit. *Id*. at p. 2, ¶¶ 6-7. By contrast, Gray avers that Carter told him that "his [TMJ symptoms] would not be addressed at this medical visit because it is a difficult problem to treat." Doc. 127 at p. 137, ¶ 40.

Meanwhile, from 2007 to 2011, Gray sought treatment from non-party LaTanya Williams, a Wexford physician assistant, twelve or thirteen times. Doc. 130 at pp. 9, 11-15, ¶¶ 29-31, 36-52; Doc. 100-3 at pp. 1-3, ¶¶ 5-15 (Williams's affidavit). On at least eleven of those occasions, the medical records do not indicate that Gray complained about TMJ pain. Doc. 130 at pp. 12-15, ¶¶ 40-52. Gray variously complained of "abdominal cramping," *id*. at p. 12, ¶ 40; "blood rushing to his head [and] heart palpitations," *id*. at p. 12, ¶ 41; "pain in his right thigh secondary to an injury he suffered during a game of kickball," *id*. at p. 12, ¶ 42; "a restrained right thigh" due to the same injury and "frequent urination," *id*. at pp. 12-13, ¶ 43; continuing "urinary tract symptoms," *id*. at p. 13, ¶¶ 44-45; "abdominal symptoms," *id*. at pp. 13-14, ¶ 46; a hurt "left pinkie" finger, *id*. at p. 14, ¶ 47; "heart palpitations [and] that his left knee locks up from time to time and pops," *id*. at pp. 14-15, ¶ 49; "heart palpitations" again, *id*. at p. 15, ¶ 50; and foot fungus, *id*. at p. 15, ¶¶ 51-52. (As for Gray's foot fungus, *see Gray v. Ghosh*, 2013 WL 5497250 (N.D. Ill. Oct. 3, 2013).) Gray raised documented TMJ concerns only on February 17, 2010, when he reported having "spasms in his right temple" and "grind[ing] his teeth." *Id*. at p. 14, ¶ 47. (Williams and the Wexford Defendants mistakenly say "April 17," but

the medical records show that the visit was actually on February 17. Doc. 100-3 at 13.) Williams prescribed anti-inflammatory pain medication and recommended a follow-up. Doc. 130 at pp. 14, ¶ 47. On March 17, when Gray complained that he had not yet received his previously prescribed medication, Williams resubmitted the prescriptions. *Id*. at p. 14, ¶ 48. But Gray "disputes he was seen by Williams on … March 17, 2010 *only* to receive medication. [Gray] was reporting his TMJ pain as [she] told him to do if it continued." *Ibid*. (emphasis added). All told, in at least twelve visits over four years, Gray complained to Williams about TMJ pain at most twice, in response to which Williams prescribed (and then re-prescribed) him pain medication. *Id*. at pp. 9, 11-15, ¶¶ 29-31, 36-52.

In late 2011, Gray filed six separate grievances demanding TMJD treatment: on August 25, October 4, October 13, October 20, December 23, and December 24, 2011. Doc. 137 at ¶¶ 4, 30, 42; Doc. 141 at ¶ 29; Doc. 130 at 66-73 (copies of grievances). At least two of these grievances mention Carter by name, and Carter was required to review all inmate medical grievances. Doc. 141 at ¶ 13. Carter, however, denies having ever seen those grievances. *Id*. at ¶ 29; Doc. 100-1 at p. 2, ¶¶ 6-7.

Gray also asserts that he spoke to Sheehy, the medical technician, "numerous times" to ask to be placed on "sick call," but Sheehy never complied. Doc. 137 at ¶ 40. As noted above, however, it is undisputed that throughout 2010 and 2011, Gray consistently received medical and dental treatment from Mitchell, Fischman, and Williams.

## Discussion

### I.    State Defendants

To prevail on his Eighth Amendment claim, Gray must show that Defendants were not merely negligent, but "display[ed] deliberate indifference to a serious medical need." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 301 (7th Cir. 2010); *see Estelle v. Gamble*, 429 U.S.

97, 104 (1976).  Deliberate indifference has an objective component, that Gray's medical condition be "objectively serious," and a subjective component, that Defendants "acted with a sufficiently culpable state of mind" in that they had "subjective knowledge of the risk to the inmate's health and … disregard[ed] that risk." *Thomas*, 604 F.3d at 301.  The fact that a prisoner has received some medical treatment does not necessarily defeat his claim because deliberate indifference to a serious medical need can be manifested by blatantly inappropriate treatment that would seriously aggravate the prisoner's condition, *see Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005), by "woefully inadequate" action, or by no action at all.  *Reed v. McBride*, 178 F.3d 849, 854 (7th Cir. 1999).  Neither medical malpractice nor a mere disagreement with a doctor's medical judgment, however, amounts to deliberate indifference. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).  The court examines the totality of the medical care provided; isolated incidents of delay do not rise to the level of deliberate indifference.  *See Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000); *Gutierrez v. Peters*, 111 F.3d 1364, 1374-75 (7th Cir. 1997).

An objectively serious medical condition is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention."  *Edwards v. Snyder*, 478 F.3d 827, 830-31 (7th Cir. 2007) (internal quotation marks omitted); *see Gutierrez*, 111 F.3d at 1373 (same).  State Defendants do not deny that Gray's TMJD issues were objectively serious.  Doc. 94.  Yet the Seventh Circuit has chided district courts for uncritically accepting claims that a prisoner's medical condition is objectively serious, even where the defendants do not contest the point.  *See Jackson v. Pollion*, 733 F.3d 786, 787 (7th Cir. 2013) ("What is troubling about the case is not its disposition but that both the district judge, and the magistrate judge whose recommendation to grant summary judgment the

district judge accepted, believed that Jackson 'can present evidence permitting a reasonable inference' that he had experienced a serious medical condition as a consequence of the interruption of his medication. This is mistaken, and (not surprisingly) has no support in the record. But it is not only repeated in the plaintiff's brief in this court, as one would expect; it is largely ignored by the defendants. This lapse is worth noting because it is indicative of a widespread, and increasingly troublesome, discomfort among lawyers and judges confronted by a scientific or other technological issue.").

Unlike the plaintiff in *Jackson*—an otherwise healthy 24-year-old who had been denied hypertension medication for only three weeks, *id*. at 788—Gray asserts that he suffers from near constant tooth and jaw pain and has for more than a decade. The Seventh Circuit has held that "dental care is one of the most important medical needs of inmates." *Bd. v. Farnham*, 394 F.3d 469, 480 (7th Cir. 2005) (quotation marks omitted) (quoting *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001), and citing cases from other circuits to the same effect); *see Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). The Seventh Circuit has also recognized that a prisoner's chronic pain can be objectively serious enough to maintain a § 1983 claim. *See Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) ("[T]here is no requirement that a prisoner provide 'objective' evidence of his pain and suffering—self-reporting is often the only indicator a doctor has of a patient's condition."); *Gutierrez*, 111 F.3d at 1371-72 (collecting cases). Accordingly, and given State Defendants' concession that TMJD can be an objectively serious medical condition, the court will assume for purposes of summary judgment that Gray has met the objective element of his claim.

Nevertheless, no reasonable factfinder could conclude that State Defendants were deliberately indifferent to Gray's medical condition. In a nutshell, Gray believes instead of being

given the standard treatments for TMJD—which in his case included four tooth extractions, equilibration, four different fitted bite guards, pain medication, and muscle relaxants—he should have been referred to an outside TMJD specialist.  But settled precedent holds that a prisoner does not have a constitutional right to be treated by an outside specialist.  *See Kendrick v. Frank*, 310 F. App'x 34, 38 (7th Cir. 2009) ("Kendrick wants an oncologist perform this procedure, but the Eighth Amendment does not confer a constitutional right to demand either a particular type of medical treatment or a certain specialist."); *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) (same); *Johnson v. Raba*, 1997 WL 610403, *3 (N.D. Ill. Sep. 24, 1997) ("a prisoner has no categorical right to be treated by a specialist").  Even were that not true, Mitchell and Fischman could not be held liable on this ground, because they lacked the authority to refer Gray to an outside specialist; that is why Mitchell suggested to Gray that he see Carter, the only one who had that power.  *See Kendrick*, 310 F. App'x at 37 ("Kendrick has come forward with no evidence that Keuler even had the *authority* to send him to a specialist.  Additionally, it is undisputed that Keuler explained to Kendrick that he would have to see Dr. Luy to receive a referral or additional treatment. … Keuler was far from indifferent to Kendrick's condition—she referred him to the prison doctor as the next step in his treatment.").

But even setting all that aside, Mitchell and Fischman treated Gray's TMJD appropriately.  In August 2013, the National Institute of Dental and Craniofacial Research ("NIDCR"), which is one of the National Institutes of Health, published a guide summarizing the current research into, and treatment guidelines for, TMJD.  *See* National Institute of Dental and Craniofacial Research, "TMJ Disorders," NIH Pub. No. 13-3487 (August 2013), *available at* http://www.nidcr.nih.gov/OralHealth/Topics/TMJ/TMJDisorders.htm (last visited March 25, 2015).  In his Local Rule 56.1(b)(3)(C) statement, Gray cited and relied on NIDCR as an

authority on TMJD.  Doc. 127 at p. 27, ¶ 35.  And the National Institutes of Health, an agency within the United States Department of Health and Human Resources, is indisputably a reputable source of health information.  *See Jackson*, 733 F.3d at 790 ("To determine the effect on the plaintiff's health of a temporary interruption in his medication, the lawyers in the first instance, and if they did their job the judges in the second instance, would have had to make some investment in learning about the condition.  That could have taken the form of … just consulting a reputable medical treatise.  The legal profession must get over its fear and loathing of science.").

The following information comes from the NIDCR guide.  TMJD refers to a group of conditions that cause pain and dysfunction in the jaw joint and muscles controlling jaw movement.  *See* NIDCR, "TMJ Disorders," *supra*.  For many persons, TMJ pain is temporary or occurs in cycles, while others develop long-term symptoms with persistent and even debilitating pain.  *Ibid.*  Scientists do not know what causes TMJD in most cases.  *Ibid.*  They also do not know why symptoms progress unpredictably: sometimes getting worse, sometimes improving significantly, and sometimes even spontaneously disappearing.  *Ibid.*  These uncertainties make it "difficult and confusing" to diagnose TMJD, and there is "no widely accepted, standard test now available to correctly diagnose TMJ disorders."  *Ibid.*  Nor is there a "certified specialty for TMJ disorders in either dentistry or medicine."  *Ibid*.

NIDCR recommends against aggressively treating TMJD:

> Because more studies are needed on the safety and effectiveness of most treatments for jaw joint and muscle disorders, experts strongly recommend using the most conservative, reversible treatments possible.  Conservative treatments do not invade the tissue of the face, jaw, or joint, or involve surgery.  Reversible treatments do not cause permanent changes in the structure or position of the jaw or teeth.  *Even when TMJ disorders have become persistent, most patients still do not need aggressive types of treatment.*

*Ibid.* (emphasis added).  NIDCR discourages irreversible treatments because they have not been proven effective.  *Ibid.*  Surgical treatments are controversial and "should be avoided where possible."  *Ibid.*  A failure to respond to conservative treatments does not mean that surgery is necessary.  *Ibid.*  Surgical replacement of jaw joints with artificial implants is also risky because it may result in more severe pain and permanent damage.  *Ibid.*  In some cases, the devices may break apart in the jaw over time.  *Ibid.*

Instead, NIDCR recommends using conservative, reversible treatments, such as eating soft foods, applying ice packs, avoiding extreme jaw movements, learning techniques for relaxing and reducing stress, and practicing gentle jaw stretching and relaxing exercises that may help increase jaw movement.  *Ibid.*  Over-the-counter pain medicines or stronger pain and anti-inflammatory medications or muscle relaxants may be used to address the pain.  *Ibid.*  Stabilization splints or bite guards are "the most widely used treatments," although because studies on their effectiveness are inconclusive, NIDCR recommends using them for only a short time.  *Ibid.*

Mitchell and Fischman, therefore, provided Gray with exactly the kind of TMJD treatment that NIDCR recommends.  As Mitchell avers, she decided to continue with the normal course of treatment because, in her opinion, the "literature reports that there is not a lot of success with TMJ surgeries."  Doc. 95-2 at ¶ 7.  She believed that Gray's condition was best addressed by ordinary palliative treatment, including analgesics, a soft-food diet, warm compresses, bite guards, and limiting the opening of his TMJ by not yawning wide and taking smaller bits of food.  *Id.* at ¶¶ 5, 8; Doc. 127 at p. 11, ¶ 32.  And although NIDCR now questions whether bite guards are effective in the long run, it also notes that they are still the most common

treatment prescribed to the 10 million or so Americans suffering from TMJD. *See* NIDCR,

"TMJ Disorders," *supra*.

Neither side has offered much detail regarding Gray's visits to Fischman in Fall 2011, but

any demurral on Fischman's part to pursue aggressive TMJD treatments would be medically

justified on the same grounds as for Mitchell. And although Gray asserts that Fischman did not

prescribe him pain medication, Gray also testified that he did not recall asking Fischman for any.

Besides, Motrin and Tylenol are considered appropriate analgesics for TMJD pain, and these

medications are available to Stateville inmates. Doc. 127 at pp. 10-11, ¶ 31.

Given the uncertainty and lack of medical consensus on the proper treatment of TMJD,

Mitchell and Fischman's relying on proven conservative treatments like bite guards and

painkillers, rather than attempting more aggressive options (assuming such options were even

available) or trying to hunt down a "TMJD specialist" (which, recall, NIDCR says does not

exist), does not even rise to negligence, let alone deliberate indifference. *See Estelle*, 429 U.S. at

107 ("Respondent contends that more should have been done by way of diagnosis and treatment,

and suggests a number of options that were not pursued. … But the question whether an X-ray or

additional diagnostic techniques or forms of treatment is indicated is a classic example of a

matter for medical judgment. A medical decision not to order an X-ray, or like measures, does

not represent cruel and unusual punishment."); *Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir.

2008) (same, and affirming summary judgment for the defendants where they "afforded [the

prisoner] some of the treatment that he demanded—pain medication the same day it was

requested and an x-ray shortly thereafter," but nevertheless "decided that, based on [the

prisoner's] account of his pain and [his] medical history, an MRI and a referral to an orthopedic

surgeon were not appropriate").

Other courts to consider prisoner claims alleging a failure to treat TMJD have reached similar conclusions. *See Amarir v. Hill*, 243 F. App'x 353, 354 (9th Cir. 2007) ("A prison inmate also does not have a right to treatment for conditions that are not readily amenable to treatment, including TMJ."); *Beem v. Davis*, 289 F. App'x 305, 307 (10th Cir. 2008) (affirming summary judgment against an inmate who claimed that the defendants' providing a dental plate and recommending a liquid diet were "feeble attempts" to treat his ongoing TMJD, reasoning that the inmate's criticism was "simply an argument that the defendants were negligent in treating his TMJ condition and does not state a valid claim of medical mistreatment under the Eighth Amendment"); *Dunson v. Kissell*, 2010 WL 3396820, at *2 (M.D. Ga. June 15, 2010) ("[T]he plaintiff acknowledges that he has received the pain medication and bite plate described above. Curiously, he then declares that 'a bite plate is not a form of treatment.' Thereafter, he asserts that, absent treatment from a specialist, his jaw condition will cause him to 'grind his teeth all the down and will lead to erosion and degeneration.' In view of the above, it is apparent that the plaintiff has received medical attention and treatment for his jaw condition. It is also clear that his claim involves a disagreement about his course of treatment, not the lack thereof."), *report and recommendation adopted*, 2010 WL 3396826 (M.D. Ga. Aug. 21, 2010); *Smith v. Conn. Dep't of Corr.*, 2008 WL 918535, at *32 (D. Conn. Mar. 31, 2008) (dismissing a prisoner's § 1983 suit alleging a failure to order surgery or other measures to treat his TMJD because "some conditions fail to respond to treatment, however appropriate. Chronic pain is a fact of life for nonprisoners as well as some prisoners, and the inability to cure it does not necessarily rise to the level of malpractice, let alone a constitutional violation").

So Mitchell and Fischman are off the hook—as are Hardy and Edwards, the warden and assistant warden. Gray emphasizes his having filed six grievances in rapid succession in Fall

2011, and relies primarily on *Santiago v. Walls*, 599 F.3d 749 (7th Cir. 2010), which reversed a grant of summary judgment to a warden who ignored a prisoner's grievance. *Id*. at 759. "The purpose of a grievance is, quite simply, to advise prison management of a situation that could harm the good order and discipline of the institution so that remedial steps can be taken by the officer who is responsible for such remedies." *Ibid*. In *Santiago*, the plaintiff complained that he had been housed with an inmate who had a known history of violently attacking cellmates, and that the guards had deliberately placed him with that inmate with the hope of starting a fight. *Id*. at 758-59. "[A]ny warden worth his or her salt," the Seventh Circuit held, "would consider such an allegation sufficient to commence an aggressive investigation." *Id*. at 759.

By contrast, Gray's grievances alerted Hardy and Edwards only to the fact that Gray needed TMJD treatment. But as far as they knew, Gray *had* been receiving nearly continuous treatment for TMJD for the past decade, and was still being treated by Fischman, Mitchell, and Williams. And after filing the series of grievances, Gray was able to see Carter as well. What more could Hardy and Edwards have done? They reasonably thought Gray's medical needs were being addressed by the medical staff. *See Zentmyer v. Kendall Cnty.*, 220 F.3d 805, 812 (7th Cir. 2000) ("Hawkins investigated the complaint and was told by three deputies that Zentmyer was receiving medication as prescribed. Under the circumstances, Hawkins reasonably believed his deputies' reports and otherwise had no involvement with Zentmyer's medical care."). Prison administrators may not be held liable for a failure to treat a prisoner's medical condition where they reasonably relied on the judgment of medical professionals. *See Johnson v. Doughty*, 433 F.3d 1001, 1012 (7th Cir. 2006); *Perkins v. Lawson*, 312 F.3d 872, 875-76 (7th Cir. 2002). That protection evaporates if the administrators know, or have reason to believe, that prison doctors are mistreating or not treating a prisoner. *See Gentry v. Duckworth*,

65 F.3d 555, 561 (7th Cir. 1995). But Gray has offered no evidence that Hardy and Edwards had reason to believe he was being *mistreated* by Fischman, Mitchell, or Williams, as opposed to simply receiving treatment that Gray disagreed with. (In fact, as noted above, Gray was *not* mistreated.) Hardy and Edwards, therefore, cannot be liable on Gray's claim. *See Johnson*, 433 F.3d at 1012 ("A non-medical prison official, such as Jones, cannot be held deliberately indifferent simply because he failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.") (quotation marks and brackets omitted); *Perkins*, 312 F.3d at 875-76 ("the fact that jail officials relied on the opinion of the doctors militates against a finding of deliberate indifference on the part of any jail personnel").

Nor can Sheehy, the medical technician. Gray's only allegation against Sheehy is that Gray spoke to him "numerous times requesting treatment for [Gray's] TMJ[D]," but that Sheehy "never scheduled [Gray] for sick-call." Doc. 137 at ¶¶ 40-43. Yet it is undisputed that throughout 2010 and 2011, Gray *did* receive treatment from Fischman, Mitchell, and Williams. So whether Sheehy put Gray on the sick-call list is immaterial, for Gray obviously had no difficulty obtaining medical treatment, and so cannot have been harmed by Sheehy's alleged inaction. *See Gutierrez*, 111 F.3d at 1374 ("Gutierrez' allegations attest to the fact that he repeatedly received treatment over this ten-month period and that at most he experienced an isolated occasion or two where he did not receive prompt treatment."); *Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1186 (7th Cir. 1985) (holding that inadequate sick call procedures are actionable only if as a result inmates are "effectively denied access to adequate medical care"); *Hartsfield v. Colburn*, 491 F.3d 394, 398 (8th Cir. 2007) (holding that a failure to respond to a sick call was not deliberate indifference where the prisoner's second sick call request resulted in his being seen by a dentist for his toothache).

## II.    Wexford Defendants

Turning to Wexford Defendants' motion, a preliminary matter is their violating Local Rule 56.1 by directly citing raw record material in their briefs, Docs. 99, 142—a practice long and repeatedly denounced in this District.  *See Mervyn v. Nelson Westerberg, Inc.*, __ F. Supp. 3d __, 2014 WL 7177614, at *4 (N.D. Ill. Dec. 16, 2014) (collecting cases); *Thorncreek Apartments III, LLC v. Vill. of Park Forest*, 970 F. Supp. 2d 828, 838-39 (N.D. Ill. 2013); *LaSalvia v. City of Evanston*, 806 F. Supp. 2d 1043, 1046 (N.D. Ill. 2011); *Solaia Tech. LLC v. ArvinMeritor, Inc.*, 361 F. Supp. 2d 797, 826-27 (N.D. Ill. 2005); *Madaffari v. Metrocall Cos. Grp. Policy GL, H-21163-0, Plan No. 501*, 2005 WL 1458071, at *1 (N.D. Ill. June 15, 2005). Moreover, many of Wexford Defendants' citations are to "Exhibits A" and "B," which are transcripts of Gray's deposition, but which are not posted on the docket.  Docs. 100-1–100-4 (containing only Exhibits C through F).  (Wexford Defendants did provide the court with courtesy hard copies.)

As this court recently said,

> A party moving for summary judgment cannot expect its motion to be granted if it fails in a significant respect to comply with the rules.  This is not an exercise in being persnickety.  Especially where (as here) arguments presented in a summary judgment motion are fact-intensive, it is essential to the court's proper consideration of those arguments for the parties to brief their legal and factual positions with reference to the Local Rule 56.1 statements and responses and not to the raw record; the value of the parties' Local Rule 56.1 statements and responses is largely lost if those materials are not cited in the briefs.  *See Daoust v. Abbott Labs.*, 2006 WL 2711844, at *4 (N.D. Ill. Sept. 19, 2006) ("Citing directly to the record in the memorandum statement of facts, as [the movant] does here, rather than citing to its 56.1(a)(3) statement, negates the purpose of the summary judgment exercise.").

*Mervyn*, 2014 WL 7177614, at *4.  The court is well within its discretion to, and does, deny summary judgment to Wexford Defendants solely on this ground.  *See Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809 (7th Cir. 2005) ("[w]e have … repeatedly held that a district

court is entitled to expect strict compliance with Rule 56.1") (internal quotation marks omitted, brackets in original); *Mervyn*, 2014 WL 7177614, at *4 (denying a summary judgment motion because the movant's brief cited to raw record materials rather than to its Local Rule 56.1(a)(3) statement); *FirstMerit Bank, N.A. v. 2200 N. Ashland, LLC*, 2014 WL 6065817, at *4-8 (N.D. Ill. Nov. 13, 2014) (same); *Thorncreek Apartments*, 970 F.Supp.2d at 839 (same); *Jacobeit v. Rich Twp. High Sch. Dist. 227*, 2012 WL 1044509, at *2 (N.D. Ill. Mar. 28, 2012) (same); *Jorden v. United States*, 2011 WL 4808165, at *1 (N.D. Ill. Oct. 11, 2011) (same); *Sledge v. Bellwood Sch. Dist. 88*, 2011 WL 2457920, at *2 (N.D. Ill. June 17, 2011) (same); *see also Eva's Bridal Ltd. v. Halanick Enters., Inc.*, 2010 WL 2035720, at *5 (N.D. Ill. May 19, 2010) ("Failure to comply with Local Rule 56.1 is grounds for denial of a summary judgment motion.").

It bears mention that the court's quick check of the record citations revealed that at least some of them do not support the assertions in Wexford Defendants' brief. One example is Wexford Defendants' assertion: "Plaintiff's own testimony has established that the only treatment that is at issue in this case took place after February, 2010. Ex. B at 29, 50." Doc. 99 at 5. Yet on page 29 of Exhibit B (as noted, a transcript of Gray's deposition), Gray merely agrees with opposing counsel's statement that "[a]t some point after January 6, 2001, [he was] found to have malocclusion" and underwent an equilibration (a filing down of his teeth) to help treat it. On page 50, Gray says that he has been suffering "constant" pain since 2003. How either of these statements supports the assertion in the brief (that all relevant events took place after February 2010) is unexplained and probably unexplainable.

Even putting aside their Local Rule 56.1 noncompliance, Wexford Defendants are not entitled to summary judgment on the merits. (Wexford Defendants do not and likely could not seek qualified immunity. *See Currie v. Chhabra*, 728 F.3d 626, 631-32 (7th Cir. 2013).) Unlike

State Defendants, Wexford Defendants do challenge the objective prong of Gray's Eighth Amendment claim, asserting that because Gray was never *formally* diagnosed with TMJD, he does not suffer from an objectively serious condition.  Doc. 99 at 4-6.  But why should the law require a formal diagnosis—especially in the prison setting, where that diagnosis would necessarily have to be made by the very defendant accused of deliberately ignoring the ailment?  Wexford Defendants cite no case law to support the assertion that a formal diagnosis is necessary to maintain a deliberate indifference claim.  Furthermore, recall NIDCR's conclusion that diagnosing TMJD is "difficult and confusing" because there is "no widely accepted, standard test now available to correctly diagnose TMJ disorders."  NIDCR, "TMJ Disorders," *supra*.  Wexford Defendants do not dispute that Gray's medical records reflect many, many complaints of TMJ pain; if nothing else, Gray's allegation that it takes him nearly 30 minutes each morning just to open his mouth is "so obvious[ly serious] that even a lay person would perceive the need for a doctor's attention."  *Edwards*, 478 F.3d at 831; *see Greeno*, 414 F.3d at 653 (same).

As for the subjective element, Wexford Defendants argue that Carter could not have been deliberately indifferent to Gray's TMJD because he never knew about it.  Doc. 99 at 6-7.  But that is a genuine factual dispute between the parties; Gray asserts, with record support, that he sent Carter a letter, filed two grievances directed at him, and directly told him during the March 2012 appointment—which, recall, was two months *after* Gray filed this lawsuit naming Carter as a defendant—that he suffered TMJ pain and had for at least a decade.  Doc. 130 at pp. 18-20, ¶¶ 58-59; Doc. 141 at ¶ 13.  A reasonable factfinder could easily conclude that Carter knew all about Gray's TMJ complaints.

Alternatively, Wexford Defendants argue that Carter's "medical judgment should be given deference."  Doc. 99 at 7.  But the "medical judgment" they refer to is Carter's conclusion

that Gray did *not* suffer from TMJD.  As Wexford Defendants summarize their position: "[T]he undisputed facts of this case demonstrate that Plaintiff … never presented with symptoms demonstrating a serious medical need related to his alleged TMJ condition."  Doc. 99 at 8. Again, this is *precisely* the disputed issue of fact in this case.  Furthermore, Wexford Defendants' assertion is unsupported by the evidence.  Carter's notes do *not* say that he evaluated Gray and decided that Gray did not have TMJD; the notes do not mention TMJD at all.  Doc. 100-1 at 5. A reasonable factfinder could conclude that the absence of a TMJD notation reflects not a reasoned medical judgment *sub silentio* that Gray did not suffer from it, but rather Carter's deliberately ignoring Gray's complaints.

Wexford Defendants could have argued that Gray has no constitutional right to see an outside specialist, or that Carter's treatment of Gray's TMJD was medically reasonable.  But they do not.  The closest they come is their two-sentence drive-by argument that "a review of [Gray's] medical records indicates that Plaintiff was continuously treated for his complaints related to his TMJ through Stateville's dental clinic.  The fact that Plaintiff expected a different course of treatment does not amount to deliberate indifference."  Doc. 99 at 7-8 (citations omitted).  That underdeveloped argument amounts to forfeiture.  *See Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("[A]s the district court found, the musical diversity argument was forfeited because it was perfunctory and underdeveloped."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and we have warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks and alterations omitted).

As for Wexford itself, it cannot be held vicariously liable under § 1983 for Carter's actions. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). Instead, Carter must show that Wexford had a "policy or custom … [that] inflict[ed] the injury … [and was] the moving force of the constitutional violation" he suffered. *Id*. at 694. Wexford is a private corporation, but it is considered "a municipality" for purposes of § 1983 liability, as its medical services at Stateville are provided under color of state law. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014) ("In a number of decisions since <u>Monell</u>, our court has applied the <u>Monell</u> standard to private corporations."); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) ("Private corporations acting under color of state law may, like municipalities, be held liable for injuries resulting from their policies and practices."); *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 n. 6 (7th Cir. 2002) ("For purposes of § 1983, we have treated a private corporation acting under color of state law as though it were a municipal entity.").

Gray argues that Wexford had a policy or custom of improperly delegating its supervision of Stateville's dentists to the dentists themselves, instead of overseeing them as Wexford's contract with the prison required it to do, and that is why Carter failed to appreciate the severity of Gray's TMJD symptoms. Doc. 129 at 11-13; *see Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 928 (7th Cir. 2004) ("Here, both Fryksdale and Morse knew of CMS employees' disregard for written policies and yet did nothing to ensure that they followed those procedures."). As evidence, Gray cites the testimony of Carter's predecessor as Stateville's medical director, Parthasarathi Ghosh, who admitted in another case that he deferred all

supervision of the prison dentists to the Stateville Dental Director (Mitchell) and failed to ensure that Wexford was following its own dental policies or its contract with the prison. *See* Opinion and Order, slip op. at 2, *McDonald v. Ghosh*, No. 09 C 5302 (N.D. Ill. March 25, 2013), ECF No. 120 ("Ghosh admitted that he had a practice of not supervising the dental care, and of reviewing patients' charts only to confirm that they had seen a dentist rather than for the adequacy of care. These practices do not meet his obligations under the contract."). Wexford contends that Ghosh's admission is irrelevant because no such admission has been made in *this* lawsuit. Doc. 142 at 7-8.

The contention is unpersuasive. Although "a statement made in one lawsuit cannot be a judicial admission in another," the prior statement "can be *evidence* in the other lawsuit." *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996); *see* Fed. R. Evid. 801(d)(2) (party statements are not hearsay). So it is entirely appropriate for Gray, in opposing summary judgment here, to raise and rely on Ghosh's admissions in the other case. And Wexford Defendants do not point to any evidence in the record that Carter, after replacing Ghosh, changed how he supervised the dental staff. Nor do they point to any evidence suggesting that Wexford's contract with the prison had changed between Ghosh's and Carter's respective tenures. Absent such evidence, a reasonable factfinder *could* conclude that nothing had changed, and that Wexford still maintained its custom or policy of inadequately supervising the dental staff.

As with the issue of Carter's liability, Wexford could have argued that Gray has no constitutional right to see an outside specialist, or that Carter treated Gray's TMJD appropriately, and that therefore it, too, cannot be held liable under *Monell*, regardless of its policies or customs. *See King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 819 (7th Cir. 2007) ("because there was no violation of Jerica's constitutional rights, there is no basis for liability on

the part of the school district"). But Wexford does not make this argument, and has therefore forfeited it for purposes of summary judgment. *See G&S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate.") (citations omitted). In any event, Wexford Defendants' serious violation of Local Rule 56.1 would be a sufficient ground to deny summary judgment in any event.

### Conclusion

State Defendants' summary judgment motion is granted, and Wexford Defendants' summary judgment motion is denied. This case will proceed to trial on Gray's Eighth Amendment claims against Wexford Health Sources and Imhotep Carter.

March 27, 2015
_____
United States District Judge